Joel S. **ARIO,** Insurance Commissioner of the Commonwealth of Pennsylvania, Petitioner

v.

**SWISS REINSURANCE AMERICA CORPORATION and Tribune Company, Respondents.**

**In Re: Swiss Reinsurance America Corporation and Tribune Company Objections to the decision of Referee Nigro.**

Commonwealth Court of Pennsylvania.

Decided Dec. 21, 2007.

Publication Ordered Dec. 28, 2007.

Deborah Cohen and Joann Hyle, Philadelphia, for petitioner.

David Briganti, Paul A. Briganti, and Christine G. Russell, Philadelphia; and Ellen G. Robinson and John H. Wickert,

Chicago, IL, for respondent, Swiss Reinsurance America Corporation.

Richard McMenamin and James E. Del-Bello, Philadelphia; and John D. Shugrue, Chicago, IL; and Jason B. Komorsky, Los Angeles, CA, for respondent, Tribune Company.

## OPINION and ORDER

Before this Court are the objections of Joel S. Ario, Commissioner, Pennsylvania Department of Insurance, acting in his capacity as Liquidator Reliance Insurance Company (Liquidator)[1] to the decision of Referee Russell M. Nigro granting summary judgment in favor of Tribune Company with respect to the loss portfolio transfers (LPT), and granting summary judgment in favor of the Liquidator with respect to the guaranteed cost program (GCP). The Liquidator asserts error in the grant of summary judgment on the basis that material issues were in dispute. I find the objections lack merit. Accordingly, I accept Referee Nigro's findings of fact and conclusions of law; further, his decision is sustained.

## Overview

■ Pursuant to Article 5, Section 530(B) of the Act, 40 P.S. § 221.30(b), the Liquidator initiated this adversary proceeding in Commonwealth Court against Defendants Swiss Reinsurance America Corporation (Swiss Re) and Tribune Company (Tribune) asking the Court to declare that Tribune was not entitled to direct access to certain amounts payable under a series of agreements between Swiss Reinsurance and Reliance Insurance Company (Reliance). The agreements are designated as the Loss Portfolio Transfer (LPT) and the Guaranteed Cost Program (GCP). The parties filed cross-motions for summary judgment, with the Liquidator arguing that consistent with *Koken v. Legion Insurance Company*, 583 Pa. 400, 878 A.2d 51 (2005), Tribune is not entitled to direct access to Swiss Re's obligations under the LPT and GCP agreements,[2] and Tribune arguing the contrary position. For purposes of the motions, all parties had to assert that material issues were not in dispute. The matter was assigned[3] to

1. In May 2001, M. Diane Koken, Insurance Commissioner for the Commonwealth of Pennsylvania, presented the Court with a petition to rehabilitate Reliance Insurance Company (Reliance Estate). By order of this Court dated May 29, 2001, the Commissioner was appointed Rehabilitator of the Reliance Estate pursuant to Article V of the Pennsylvania Insurance Department Act, 40 P.S. §§ 221.1–231. By the terms of that order, all assets of the Reliance Estate were placed under the control of the Commissioner acting as Rehabilitator and the Commonwealth Court.

 Subsequently, the Liquidator advised the Court that with an Estate value nearing, if not in excess of $200 million, and potential claims numbering in the hundreds of thousands, the insolvency of the Reliance Estate was more profound than initially presented, and it was in need of immediate and constant attention. Upon further petition dated October 3, 2001, the Commissioner advised this Court that she consented to the entry of an order terminat-

ing the rehabilitation of the Reliance Estate, placing the Reliance Estate into liquidation, and appointing the Commissioner as Liquidator, pursuant to Article V. This Court granted the petition, and Reliance was placed into liquidation.

2. Alternatively, the Liquidator argued that there are facts in dispute and that summary judgment is not available. This argument the Liquidator has waived, as argument in the alternative is not available in this instance. Summary judgment is based upon the assertion that facts are not in dispute. If the Liquidator had doubts about this position, then no motion should have been filed.

3. The Court adopted the Referee appointment program to facilitate the prompt disposition of all filings in the Court. The adoption of this program is reflective of the size of the Reliance Estate, and is consistent with Section 541(b) of the Act, 40 P.S. § 221.41(b),

Referee Nigro. Referee Nigro granted, in part, the Liquidator's motion for summary judgment finding that under the GCP Tribune was not entitled to direct access to reinsurance proceeds. Referee Nigro granted Tribune's motion for summary judgment finding that under the LPT, Tribune was entitled to direct access to reinsurance proceeds. Both the Liquidator and the Tribune have filed Objections to the decision of the Referee.

■ The Liquidator raises two objections. Initially, the Liquidator argues that summary judgment was improper as material issues are in dispute. This argument is without merit and if it stood alone, it could be viewed as vexatious as the argument is frivolous. The predicate upon which a motion for summary judgment is filed is the affirmative assertion that no material issues are in dispute. "Agreement regarding material facts" is the fundamental concept of the motion therefore, upon filing a motion for summary judgment, the moving party cannot, as the Liquidator has done here, avail himself of the practice of arguing in the alternative. If material issues are in dispute, then the filing of a motion for summary judgment is frivolous. I find no merit to the Liquidator's assertion that material issues are in dispute, and conclude that the argument is specious but not vexatious. Because there are no material issues in dispute, the findings of fact and conclusions of law issued by Referee Nigro, and appended to this decision identified as "Referee Nigro

Decision," are accepted, and adopted *in toto.*

The Liquidator next asserts that the Referee erred as a matter of law in denying his motion for summary judgment regarding the LPT and granting Tribune direct access to the reinsurance proceeds. Similarly, Tribune argues that the Referee erred as a matter of law in denying its motion for summary judgment regarding the GCP and not allowing it direct access to the reinsurance proceeds.

The grant of summary judgment occurs only where there is no genuine issue of any material fact as to a necessary element of the cause of action or defense which could be established by additional discovery or expert report, or, if after the completion of discovery relevant to the motion, an adverse party who will bear the burden of proof at trial has failed to produce evidenced of facts essential to the cause of action or defense. Pa. R.C.P. No. 1035.2. To defeat a summary judgment motion, the adverse party must come forth with evidence showing the existence of the facts essential to the cause of action or defense. Not to Rule 1035.2. A fact is material if it directly affects the disposition of the case. *Allen v. Colautti,* 53 Pa. Cmwlth. 392, 417 A.2d 1303 (1980). The court must accept as true all well-pleaded facts in the non-moving party's pleadings, as well as admissions on file, giving them the benefit of all reasonable inferences to be drawn therefrom. *Hankin v. Mintz,*

and Section 323 of the Judicial Code, 42 Pa.C.S. § 323, and has occurred with the consent of the Liquidator. The Court employed this method to complement the overall purpose of the Act which purpose is to protect the interests of insureds, creditors, and the public generally. 40 P.S. §§ 221.1(c). The Act seeks to improve methods for rehabilitating insurers, and to enhance efficiency and economy, by minimizing legal uncertainty and litigation. *Id.*

While the referee appointment program was employed to resolve claim disputes, 40 P.S. § 221.41(b) of the Act directs that disputed claims shall be heard by Commonwealth Court or by a court-appointed referee who shall submit to Commonwealth Court findings of fact along with a recommendation, it is also used to assist in the resolution of certain discreet litigation which is in the form of actions initiated by the Liquidator.

276 Pa.Super. 538, 419 A.2d 588 (1980). The entire record is to be examined in the light most favorable to the party opposing the motion, and all doubts concerning the existence of a genuine issue of fact must be resolved in that party's favor. *See Bowman v. Sears Roebuck & Company,* 245 Pa.Super. 530, 369 A.2d 754 (1976). Herein, the issue to resolve was whether the LPT and GCP agreements are assets of the Reliance Estate or whether the Tribune should be permitted direct access to the reinsurance proceeds. Because there is no doubt as to a triable issue, specifically whether the conduct of the parties allows for a cut-through to reinsurance monies, I find that the Liquidator was not entitled to a judgment as a matter of law with regard to the LPT, and Tribune was not entitled to a judgment as a matter of law with regard to the GCP.

### Gross Compensation Program (GCP)

*The Referee correctly granted the Liquidator's motion for summary judgment denying Tribune direct access to Swiss Re's GCP obligations.*

In granting the Liquidator's motion for summary judgment, Referee Nigro reviewed the pleadings, depositions, and documentary evidence. Initially, it should be noted that Tribune is the successor-in-interest to Times Mirror. When the initial transactions occurred, the entities involved were Swiss Reinsurance (Swiss Re) and Times Mirror; Swiss Re involved Reliance. As the successor-in-interest to Times Mirror, Tribune defended this action brought by Reliance in Liquidation.

I accept the Referee's finding that in late 1997 and early 1998 Times Mirror's insurance broker, J & H Marsh and McLennan (Marsh), made two recommendations to Times Mirror. Marsh recommended that Times Mirror consider transferring its known and existing self-insured workers' compensation liabilities to an insurance company and recommended a retrospective program (LPT) which will be discussed infra. Marsh also recommended that Times Mirror fully insure its workers' compensation obligations on a going forward basis rather than continuing to self-insure obligations for workers' compensation, and he recommended a prospective program in the form of a GCP.

Ultimately, Swiss Re agreed to assume Times Mirror's liabilities but it could only do so with the participation of a fronting insurance company.[4] Reliance was chosen as the front carrier, and by March of 1998 Reliance had agreed to an aggregate cover for the GCP and Reliance issued a binder of insurance covering the GCP. The GCP Binder provided $8,500,000 in limits for three years of coverage based upon three annual premium payments. The first payment was for $7,093,750, based upon an estimated pro-rata payroll of $637,554,920, and the second and third premium payments were each $8,125,000 based upon an estimated pro-rata payroll of $850,000,000. Under the GCP Binder, Reliance insured Times Mirror's going forward business for 1998, 1999, and 2000. Contemporaneous with the issuance of the GCP Binder, Reliance sent Swiss Re a deal memo confirming in writing Swiss Re's participation in the transaction. Subsequently, the deal was memorialized in three separate agreements, one for each year, and each titled Workers' Compensation and Employer's Liability Quota Share Reinsurance Agreement (GCP Agreement).

4. Fronting is an arrangement whereby one licensed insurer issues a policy on a risk for and at the request of one or more other unlicensed insurers with the intent of passing the entire risk by way of reinsurance to the other insurer(s). (Strain, Robert W. Reinsurance, Revised Edition, 1997.)

As provided for in the GCP Agreement, Reliance had $7,125,000 in overall limits for the first year; $9,500,000 in overall limits for the second year, and $8,5000,000 in overall limits for the third year. Reliance paid Swiss Re $4,650,000 and all second injury fund recoveries for the truncated 1998 period, and $6,200,000 and all second injury fund recoveries for both 1999 and 2000. In return Swiss Re assumed 100% of Times Mirror's workers' compensation liabilities in those years, subject to interim and aggregate limits. While Reliance requested excess liability coverage for the GCP, Swiss Re failed to provide the excess liability coverage for the GCP claims, leaving Reliance exposed for Swiss Re's responsibilities exceeding the overall caps.

Reliance entered into a Claims Service Agreement (CSA) with a third party administrator (TPA). The CSA placed Reliance into the role of guarantor and shifted all of its claim obligations to Swiss Re. The undisputed evidence is that Swiss Re was directly responsible for the payment of the GCP claims. When Reliance was placed into liquidation, Swiss Re refused to continue to pay Tribune's workers' compensation obligations unless the Liquidator consented, and the Liquidator refused to give consent. As a result, Swiss Re stopped paying Times Mirror's outstanding workers' compensation obligations, and Tribune had to reassume and pay the obligations that were subject to the GCP. The arrangement is not a true reinsurance arrangement, but rather, more akin to traditional insurance; therefore, under the test set forth in *Legion*, Tribune was not entitled to direct access to the GCP.

▆▆▆ Reinsurance is one of the major assets of the estate of an insolvent insurance company. Thus, the general rule is that the liability of the reinsurer is intended to run to the estate of the insolvent insurer for the eventual benefit of the insureds, and not directly to the policyholders of the insurer. *Eastern Engineering v. American Re–Insurance Co.*, 309 Pa.Super. 578, 455 A.2d 1235, 1237 (1983). Where, however, an insolvent insurance company acts as a mere pass-through and does not act as a true insurer, direct access to reinsurance may be allowed. Section 534 of the Act relating to reinsurer liability, directs that

> The amount recoverable by the liquidator from reinsurers shall not be reduced as a result of delinquency proceedings, regardless of any provision in the reinsurance contract or other agreement. Payment made directly to an insured or other creditor shall not diminish the reinsurer's obligation to the insurer's estate except when the reinsurance contract provided for direct coverage of an individual named insured and the payment was made in discharge of that obligation.

40 P.S. § 221.34. Recognizing that the relationship between the contractual parties extends beyond the written contract, the *Legion* court concluded that it was necessary to analyze the specific facts of each case to determine whether direct access to reinsurance proceeds should be permitted. Where there is a fronting reinsurance arrangement equity suggests that direct access be permitted. A front arrangement is not traditional insurance, as it places the front insurer in the position that it may collect a fee or premium without exposing itself to liability. "Exposure" is the essential feature that distinguishes insurance and reinsurance. Insurance is the transfer of risk from the insured to the insurer. It is a contractual relationship wherein one party indemnifies another against loss, damage, or liability arising from unknown or contingent events. (Black's Law Dictionary, 6th Ed. 1990.) The amount of the

loss is the insured's exposure. Where there is reinsurance, the insured's "exposure," in full or in part, is insured by the reinsurer.

 To determine whether to allow direct access to reinsurance the factors considered are:

1) did the insurer take on any underwriting risk or act as a front;

2) did the insurer enter into the transaction in order to generate fees, and not premium;

3) did the 'reinsurer' function as a 'direct insurer' for the policyholder and was the claims handling process and the funding of claims the responsibility of the reinsurer;

4) did the policyholder facilitate the reinsurer's involvement;

5) did the equities favor the policyholder's claim to direct access.

*Legion,* 831 A.2d at 1234–1238. *Sub judice,* pursuant to a contractual arrangement in which Reliance would receive a certain sum of money for fronting business for Swiss Re, Reliance agreed to act as an intermediary between Swiss Re and Tribune. The premium or fee that Reliance was to receive for this business transaction was based on prospective insurance policies and the underlying policies were for unknown claims. In addition, the GCP transaction was not structured as an upfront arrangement as Reliance retained underwriting risk, *i.e.,* was exposed to liability, since Swiss Re failed to insure Reliance's liability over the aggregate limits. Finally, the state guaranty associations are paying claims under the GPC and submitting those claims to the Reliance Estate. Here, Tribune is not entitled to direct access.

Tribune argues that the both the facts and the equities compel a different conclusion. Tribune argues that while there are features of the arrangement that suggest a traditional insurance policy, in fact, Reliance had no underwriting risk which fact is evidenced by Reliance accounting for the GCP as fees rather than as liabilities. I cannot agree with Tribune's argument.

The mere fact that Reliance did not properly account for liabilities does not limit Reliance's potential exposure. The evidence is that Reliance anticipated that Swiss Re would shield it from exposure. While the transaction may have been designed so that Reliance would assume no insurance risk, the design fell short, and Reliance was exposed to liability. Moreover, equity does not dictate direct access. With the exception of the Connecticut Insurance Guaranty Association, other state guaranty associations are paying claims under the guaranteed cost policies and submitting those claims to the Reliance Estate. Thus, Tribune has some guaranty fund protection with respect to the GCP claims, and direct access to the reinsurance proceeds is not available.

## Loss Portfolio Transfer (LPT)

***The Referee correctly granted the Tribune's motion for summary judgment allowing Tribune direct access to Swiss Re's LPT obligations.***

 As previously stated, Marsh recommended that Times Mirror consider transferring its known and existing self-insured workers' compensation liabilities to an insurance company and recommended a retrospective program (LPT). Under the LPT, those self-insured workers' compensation obligations that had already accrued, and that were fully reserved by Times Mirror, would be transferred to and fully assumed and discharged by a third party insurance company. This program required Times Mirror's payment of an actuarially determined net present value of the workers' compensation obligations be-

ing transferred to and assumed by the insurer. Times Mirror engaged Swiss Re-insurance (Swiss Re) for the transaction, and Swiss Re chose Reliance to serve as the fronting carrier. In March 1998, Reliance issued the LPT Binder, which was the binder of insurance covering the LPT.

The LPT Binder provided that for the gross premium of $42,826,250, Reliance would provide workers' compensation/employers liability coverage, including other states' coverage, loss portfolio transfer for all previously self-insured claims wherever Times Mirror Company and Subsidiaries were a qualified self insurer, for each year of the contract. The $42,826,250 reflected the net present value of the estimated ultimate claim payments and expenses to be insured in the investigation, settlement, and payment of claims. Times Mirror prepaid the full value of its known losses prior to the inception of the LPT. There were delays in transferring the liabilities, and following an account reconciliation, in April 1998 a credit of $5,356,110 was given to Times Mirror for claims it paid that were otherwise covered by the LPT, and Times Mirror was invoiced $37,470,140 net for the LPT.

Contemporaneous with the issuance of the LPT Binder, Swiss Re was sent a memo confirming Swiss Re's participation in the transaction. The memo explained that Reliance would transfer approximately 84% of Times Mirror's up-front payment to Swiss Re in exchange for Swiss Re's assumption and payment of Times Mirror's pre-existing workers' compensation liabilities on a dollar-for-dollar basis. Upon consummation of the Times Mirror/Reliance LPT deal, Reliance and Swiss Re entered into a Quota Share Reinsurance Agreement whereby the terms set forth in the memo above were memorialized, thereby, creating a document that evidenced the pass through of nearly all the monies paid by Times Mirror for assumption of its LPT liabilities and the transfer of the liabilities to Swiss Re at a first dollar level, subject to certain caps.

Pursuant to the Reliance/Swiss Re LPT, Reliance was to pay Swiss Re $31,050,169 of the $37,470,140 Reliance received from Times Mirror, and Reliance identified the monies as a "fee" rather than a "premium." In exchange for the $31,050,169, Swiss Re agreed to directly fund up to $42,525,000 of the Times Mirror liabilities, subject to interim and overall aggregate caps of $1,000,000 per occurrence. Reliance's exposure was for the monies in excess of $1,000,000. However, Reliance's exposure was limited, because Times Mirror had traditional excess insurance that applied to workers' compensation claims covered by the LPT where the liability exceeded the $1,000,000 per occurrence. Nonetheless, to ensure that Swiss Re and not Reliance would be responsible for the assumption of Times Mirror's workers' compensation obligations, Reliance entered into a CSA with a TPA.

Under the CSA, Reliance was the guarantor and it shifted all its claims obligations to Swiss Re. Consistent with the CSA and Swiss Re's assumption of Times Mirror's liabilities from approximately 1998 to October 2001, Swiss Re paid Times Mirror's workers' compensation claims under the LPT, and Swiss Re directly funded a paid loss account with the TPA through which the Times Mirror LPT claims were paid. The evidence of record established that while Swiss Re paid the TPA approximately $27 million on LPT workers' compensation claims, there is no evidence that Reliance ever paid a Times Mirror LPT claim.

Once Reliance was found to be insolvent and placed into liquidation, Tribune, which had now become Times Mirror's successor-in-interest, sought to have Swiss Re con-

tinue to perform its obligations under the various agreements. Swiss Re refused, unless the Liquidator consented. The Liquidator refused to consent, and Swiss Re stopped paying Times Mirror's outstanding LPT workers' compensation obligations. Tribune then reassumed and paid the workers' compensation liabilities and associated expenses that had been assumed by Swiss Re. The state guaranty associations have refused to cover the LPT losses on the basis that the LPT was not insurance and therefore there is no guaranty fund protection. Tribune seeks direct access to the reinsurance proceeds held by Swiss Re.

Referee Nigro concluded that under *Legion* direct access was permissible in this instance as the evidence establishes that Reliance was a fronting company that was used to pass through Times Mirror's pre-existing self-insured workers' compensation liabilities to the true obligor, Swiss Re. He further found that due to fronting arrangement and the excess insurance, Reliance retained no liability, and finally, the CSA expressly provided for Swiss Re's direct funding of the TPA's LPT claim account. Finally, the Referee concluded that the equities favor permitting Tribune direct access to the LPT claims. I must agree.

■ Succinctly put, the evidence is that Reliance and Swiss Re entered into an agreement by which Swiss Re would pay Reliance an agreed upon sum of money in return for which Reliance, a Pennsylvania-licensed insurance company, would allow Swiss Re to use its license to operate in Pennsylvania. The arrangement worked until Reliance was declared insolvent and the insurance commissioner refused to consent to allow Swiss Re to continue to perform under the contractual arrangement. There is simply no evidence of record to establish that Reliance had any exposure under the LPT or that Reliance received any funds. Since all monies simply passed through Reliance it could be nothing more than a fronting company. Therefore, under *Legion*, the LPT is not an asset of the Estate, as the evidence establishes that Reliance acted as a fronting agent, was not exposed to liability, and all funds were paid directly to the reinsurer.

Accordingly, the Court enters the following

## ORDER

**AND NOW** this 21st day of December, 2007, the Liquidator's Objections to the decision of Referee Nigro with respect to the LPT is OVERRULED; Tribune's Objection to the decision of Referee Nigro with respect to the GCP is OVERRULED; the decision of Referee Nigro is SUSTAINED.

Further, the Liquidator is directed to forthwith serve a copy of this Memorandum Opinion and Order on all parties of record, and also, to serve all on the Master Service List associated with the case filed at No. 269 M.D. 2001. An affidavit that service has been effectuated shall be filed with this Court.

## APPENDIX

### *GCP*

#### *Findings of Fact*

1) Tribune is a corporation incorporated under the laws of the state of Delaware with its principal place of business in Chicago, Illinois. It is the successor-in-interest by merger to Times Mirror Company ("Times Mirror").

2) Reliance Insurance Company (in liquidation), successor to Reliance National Indemnity Company ("Reliance"), is an insurance company incorporated under the

laws of the Commonwealth of Pennsylvania.

3) M. Diane Koken (the "Liquidator") is the Insurance Commissioner of the Commonwealth of Pennsylvania and the Statutory Liquidator of Reliance.

4) Swiss Reinsurance America Corporation ("Swiss Re") is a corporation incorporated under the laws of the state of New York with its principal place of business in New York.

5) On April 20, 2005, the Liquidator filed the instant action against Tribune and Swiss Re by way of Complaint that sought a judicial declaration that Tribune was not entitled to direct access with respect to amounts payable under an integrated risk transfer transaction embodied in a series of related agreements between Swiss Re and Reliance referred to as the Loss Portfolio Transfer ("LPT") and Guaranteed Cost Program ("GCP").

6) Tribune filed an Answer to the Liquidator's Complaint, and later an Amended Answer to the Complaint, which included affirmative defenses in the form of new matter by which it seeks a declaration from this Court that it is entitled to direct access to Swiss Re's obligations under the LPT and GCP agreements at Issue in this case, and in accordance with the parties' intentions and course of performance, under theories of third-party beneficiary and/or reformation as articulated in *Koken v. Legion Ins. Co.[*, 583 Pa. 400], 878 A.2d 51 (Pa.2005), *affirming* 831 A.2d 1196 (Pa. Commw.2003).

7) From 1977 to April 1, 1998, Times Mirror was self-insured for its statutory workers' compensation obligations in several states and up to certain amounts.

8) Specifically, Times Mirror was self-insured for any liability it incurred for workers' compensation liability up to $1,000,000 per occurrence in California, New York, Maryland, Connecticut, Rhode Island, Oregon, Colorado, and Pennsylvania, and it was covered by various excess policies for amounts exceeding $1,000,000 per occurrence.

9) To cover its liability to pay its self-insured workers' compensation liabilities, as of late 1997/early 1998 Times Mirror had established a reserve of over $42 million. This reserve was determined actuarially to cover the self-insured portion of Times Mirror's workers' compensation obligations that accrued between 1977 and April 1, 1998.

10) These self-insured workers' compensation obligations were known and existing liabilities that Times Mirror already had incurred. The workers already had suffered an injury or illness that entitled them to workers' compensation benefits; these claims already had been presented to Times Mirror; Times Mirror already had paid certain amounts on such claims; and Times Mirror was liable to pay additional amounts on such claims for many years in the future.

11) In late 1997 and early 1998, Times Mirror's insurance broker, J & H Marsh & McLennan ("Marsh"), recommended that Times Mirror consider transferring its known and existing self-insured workers' compensation liabilities to an insurance company, as well as fully insuring its workers' compensation obligations on a going forward basis.

12) As for the latter, Marsh proposed a "prospective" program whereby after April 1, 1998 Times Mirror's formerly self-insured obligations for workers' compensation would be insured fully on a going forward basis, rather than self-insured by Times Mirror as they had been prior to April 1, 1998. This prospective program was a GCP.

13) Marsh prepared and made submissions to potential insurers of the GCP on behalf of Times Mirror.

14) In January 1998, Marsh contacted Swiss Re to determine whether Swiss Re would be interested in prospectively insuring Times Mirror against workers' compensation claims through the GCP.

15) Upon reviewing the Times Mirror information, Swiss Re contemplated assuming Times Mirror's liabilities either with the use of an insurance company that would serve as a "front" for Swiss Re or directly without any "front."

16) "Fronting" companies typically retain little or no liability and instead pass such liability on to reinsurers. "Fronting" is an arrangement where an insurer that is licensed to do business agrees to enter into an agreement so that the "insured" will have access to any required "insurance" documentation, but the liabilities will be the responsibility of, and will be paid by, another reinsurer. Reinsurance Contract Wording 113 (Robert W. Strain, ed., 3d ed. 1998).

17) Swiss Re acknowledged that it was planning on participating in the LPT and GCP transactions and ultimately determined that it would need the participation of an insurance company to act as a front because of the timing of the transaction and the fact that Swiss Re could not issue the requisite insurance documentation needed for the transaction.

18) Reliance was ultimately chosen to serve as the "fronting" carrier.

19) By March of 1998, Swiss Re confirmed that Reliance had agreed to an aggregate cover for the GCP.

20) Reliance then issued a Binder of Insurance covering the GCP ("the GCP Binder") evidencing that Times Mirror was now fully "insured" for the transferred GCP liabilities.

21) The GCP Binder provided $8,500,000 in limits for three years of coverage, in exchange for payments as follows:

Year One (1998): $6,093,750 Minimum & Deposit Premium, based upon estimated pro-rated payroll of $637,554,920

Year Two (1999): $8,125,000 Deposit Premium, based upon estimated payroll of $850,000,000

Year Three (2000): $8,125,000 Deposit Premium, based upon estimated payroll of $850,000000

22) In return for these deposit "premiums," Reliance would provide the following insurance coverage:

Coverage(s): Workers Compensation/Employers Liability Coverage, including Other States Coverage.

23) Under the GCP Binder, Reliance "insured" Times Mirror's going forward obligations for 1998, 1999 and 2000.

24) Contemporaneous with the issuance of the GCP Binder confirming that the transaction was bound, Robert Rey of Reliance sent Dave Powell of Swiss Re a deal memo confirming in writing Swiss Re's participation in the transaction.

25) After Reliance and Swiss Re consummated the transaction with Times Mirror, Reliance and Swiss Re memorialized their agreement in three separate agreements (one for 1998, 1999 and 2000, respectively) each titled "Workers Compensation and Employers Liability Quota Share Reinsurance Agreement" (collectively the "Reliance/Swiss Re GCP Agreements"), whereby the pass through of most of the monies paid by Times Mirror for assumption of its GCP liabilities and the transfer of these liabilities was memorialized, and Swiss Re became responsible for paying 100% of the liabilities covered by the Times Mirror/Re-

liance GCP Agreements at a first dollar level, subject to certain caps.

26) Pursuant to the Reliance/Swiss Re GCP Agreements, Reliance had $7,125,000 in overall limits for the first year of the GCP; $9,5000,000 in overall limits for the second year of the GCP; and $8,500,000 in overall limits for the third year of the GCP.

27) In turn, Reliance paid Swiss Re $4,650,000 and all second injury fund recoveries for the truncated 1998 period, $6,200,000 and all second injury fund recoveries for 1999, and $6,200,000 and all second injury fund recoveries for 2000, for Swiss Re's assumption of 100% of Times Mirror's workers' compensation liabilities in those years, subject to interim and aggregate limits.

28) By their terms, the Reliance/Swiss Re GCP Agreements limit Swiss Re's obligations to one $250,000 per occurrence limit for GCP claims, whether the workers' compensation claims exceeded these limits or not. At the same time, the Agreements have annual and overall caps on what Swiss Re is obligated to pay Reliance regardless of how much Reliance was obligated to pay for Times Mirror's workers' compensation claims.

29) Although Reliance requested, and Swiss Re provided, excess liability policies for the GCP claims, such coverage was not complete and did not leave Reliance fully protected in the event that Swiss Re's payment responsibilities exceeded the overall caps that had been set.

30) Reliance entered into a Claims Service Agreement ("CSA") with a third party administrator ("TPA"), Crawford and Company ("Crawford").

31) Pursuant to the terms of the CSA, Reliance placed itself in the role of guarantor and shifted all of its claims obligations, including its obligation to pay the claims, to Swiss Re:

VIII. *Guarantor,* All obligations recited in this Agreement ... wherein [Reliance] agrees to pay and make funds available to [the TPA's] Loss fund Account (including implementation of procedures to make funds available) to enable [the TPA] to pay Claims and/or losses and associated Allocated Loss Expenses, are intended to and hereby do make [Reliance] the guarantor thereof. [Reliance] requests, and [the TPA] hereby agrees to submit billings for payments to its Loss Fund Account directly to [Reliance's] reinsurance carrier, [Swiss Re] for payment directly to [the TPA] ... Any specific billing items disputed by Swiss Re will be mutually resolved between [the TPA] and Swiss Re.

32) Consistent with the CSA and Swiss Re's assumption of Times Mirror's liabilities, from approximately May 1998 to October 2001, Swiss Re paid Times Mirror's workers' compensation claims under the GCP.

33) Consistent with its obligations to pay the GCP liabilities directly, Swiss Re directly funded a paid loss account with Crawford through which the Times Mirror GCP claims were paid.

34) Crawford created a flow chart demonstrating that Swiss Re was directly responsible for the payment of the GCP claims. This chart specifically indicated that, "Swiss Re America agrees to directly fund Crawford for this program." II TR 61, at SR 9266; II TR 62, at SR 9420.

35) On October 3, 2001, Reliance was found to be insolvent and placed into liquidation.

36) When Reliance was placed in liquidation, Tribune, in its capacity as Times Mirror's successor-in-interest, undertook to have Swiss Re continue its performance

of the obligations to pay the outstanding workers' compensation obligations.

37) Swiss Re refused to continue to pay unless the Liquidator consented.

38) The Liquidator refused to consent.

39) Swiss Re stopped paying Times Mirror's outstanding workers' compensation obligations.

40) As a result, Tribune has been forced to reassume and pay, and has been subject to demands that it pay, GCP workers' compensation liabilities and associated expenses that had been assumed by Swiss Re.

41) Before liquidation, approximately $15 million in claims were paid under the GCP and billed to Swiss Re. The value of GCP claims will likely exceed the remaining reinsurance limits under the Reliance/Swiss Re GCP Agreements.

*Conclusions of Law*

1) This Court has subject matter jurisdiction over this action pursuant to 40 P.S. § 221.1 *et seq.* and 42 P.S. § 761(a)(2).

2) Summary judgment may be entered where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Pa. R. Civ. P. 1035.2.

3) This case is about Tribune's right to direct access to Swiss Re's assumed obligations under the GCP. Accordingly, it involves whether such access is authorized under Article V of the insurance Department Act of 1921, 40 § 221.1 *et seq.,* and thus is governed by Pennsylvania law, including *Koken v. Legion Ins. Co.*[, 583 Pa. 400], 878 A.2d 51 (Pa.2005), *affirming* 831 A.2d 1196 (Pa.Commw.2003).

4) The general rule in liquidations is that "the liability of the reinsurer is intended to run to the estate of the insolvent insurer

for the eventual benefit of the insureds, and not directly to the policyholders of the insurer." *Eastern Engineering v. American Reinsurance Co.*[, 309 Pa.Super. 578], 455 A.2d 1235, 1237 (Pa.Super.1983).

5) This general rule is recognized by Pennsylvania courts, including the *Legion* Court. *See Legion,* 831 A.2d at 1234.

6) However, *Legion* also held that direct access may be appropriate on a third party beneficiary theory or through reformation of an agreement. *Id.* at 1236, 1241–42.

7) Under Pennsylvania law, an insured may obtain direct access to a reinsurer's obligations in the event of an insurer's insolvency where circumstances warrant. *Id.* at 1236.

8) Direct access to "reinsurance" is a right established on a case-by-case basis, based on the totality of the facts and circumstances. *Id.*

9) Although reinsurance proceeds typically become general assets of the estate in liquidation proceedings where there is a traditional insurer-reinsurer relationship, this general rule may not apply in situations "where the insolvent insurer acted only as a pass-through and not as a true insurer." *Id.*

10) Even absent contractual privity, it is appropriate under certain circumstances to allow a policyholder to have direct access to a reinsurer. *Id.* at 1239–40.

11) Where entitlement to direct access to "reinsurance" is shown, there is no unlawful preference under Pennsylvania law. *Id.*

12) Direct access to reinsurance is appropriate under a third-party beneficiary theory where "(1) recognition of the beneficiary's right [is] 'appropriate to effectuate the intention of the parties,' and (2) contract performance ... "satisf[ies] an obligation of the promisee to pay money to the bene-

ficiary' or 'the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance." *Id.* at 1237.

13) Factors to consider when determining whether this two-part test has been satisfied so as to allow a policyholder direct access to reinsurance include:

(a) whether the insurer took on any underwriting risk or acted as a front, *Id.* at 1237–38.

(b) whether the insurer entered into the transaction in order to generate fees, not premium, *id.* at 1234.

(c) whether "the 'reinsurer' functioned as the direct insurer" for the policyholder and whether the "claims handling process [and] the funding of claims ... [w]as the responsibility of the reinsurers," *id.* at 1237–38.

(d) whether the policyholder facilitated the reinsurer's involvement, *id.* at 1241, 1247.

(e) whether the equities favor the policyholder's claim to direct access, *id.* at 1242, 1246.

14) These factors are not a checklist of specific facts that must be present in order to permit direct access, nor are they a checklist that must be present in precisely the same way as existed in *Legion*. Rather, the factors are overarching criteria by which to analyze the particular facts involved in a transaction for purposes of deciding the issue of direct access to "reinsurance." *Id.* at 1236.

15) An insured may be a third-party beneficiary with a right to direct access from a reinsurer notwithstanding the lack of an express "cut-through" provision in the relevant agreements. As the *Legion* Court explained:

Section 534 of Article V does not require a cut through endorsement in the form of holy writ; it does not even use the term "cut-through." Even if the statute had used those works, its meaning would be less than clear in light of the fact that there is more than one way to effect a cut through.

*Id.* at 1241.

16) Alternatively, the court may "reform" the reinsurance agreement to permit direct access in order to (1) "ensure that the [Liquidator's] actions are consistent with equitable principles and serve the interest of policyholders, and (2) "to reflect the parties' intent if necessary and appropriate to avoid prejudice to policyholder rights." *Id.* at 1242.

17) In contrast to the LPT, the factors identified in *Legion* do not weigh in favor of affording Tribune direct access to Swiss Re's GCP obligations.

18) First, the GCP transaction was much more akin to "traditional insurance" than the LPT transaction was, given that the GCP transaction involved prospective and unknown claims rather than the known and existing claims that formed the basis for the LPT transaction. In contrast to the LPT transaction, the GCP transaction simply did not represent the mere upfront pre-payment of the actuarially determined net present value of the liabilities at issue.

19) Moreover, unlike in the context of the LPT transaction, the GCP transaction was not structured in such a way that made Reliance a mere "front" or pass-through for Swiss Re. Instead, Reliance retained some underwriting risk given that Reliance's potential exposure exceeded Swiss Re's annual and overall caps contained in the Reliance/Swiss Re GCP Agreements. Importantly, if Swiss Re's payment responsibilities exceeded the overall caps, Reliance was obligated to pay at least some portion of the excess.

20) While it is true that Reliance insisted that its payment to Swiss Re for coverage of the GCP claims be called a "fee" rather than a "premium," and while the CSA that Reliance entered into with the TPA expressly provided for Swiss Re's direct funding of the TPA's claim account, the factors identified in *Legion* still do not weigh in favor of allowing Tribune direct access to the GCP claims in light of the fact that the equities do not dictate such a result here. First, contrary to what occurred under the LPT transaction, Tribune has not already paid the net present value of the LPT claims upfront and would not, therefore, be forced to pay for them a second time if direct access is not allowed. Second, state guaranty associations, with the exception of the Connecticut Insurance Guaranty Association, are paying claims under the guaranteed cost policies and submitting those claims to the Reliance Estate. Thus, unlike in the context of the LPT claims, Tribune has some guaranty fund protection with regards to its GCP claims.

21) Accordingly, when applying the *Legion* factors to the GCP transaction, it is clear that Tribune is not entitled to direct access to Swiss Re's GCP obligations.

### *LPT*

### *Findings of Fact*

1) Tribune is a corporation incorporated under the laws of the state of Delaware with its principal place of business in Chicago, Illinois. It is the successor-in-interest by merger to Times Mirror Company ("Times Mirror").

2) Reliance Insurance Company (in liquidation), successor to Reliance National Indemnity Company ("Reliance"), is an insurance company incorporated under the laws of the Commonwealth of Pennsylvania.

3) M. Diane Koken (the "Liquidator") is the Insurance Commissioner of the Commonwealth of Pennsylvania and the Statutory Liquidator of Reliance.

4) Swiss Reinsurance America Corporation ("Swiss Re") is a corporation incorporated under the laws of the state of New York with its principal place of business in New York.

5) On April 20, 2005, the Liquidator filed the instant action against Tribune and Swiss Re by way of Complaint that sought a judicial declaration that Tribune was not entitled to direct access with respect to amounts payable under an integrated risk transfer transaction embodied in a series of related agreements between Swiss Re and Reliance referred to as the Loss Portfolio Transfer ("LPT") and Guaranteed Cost Program ("GCP").

6) Tribune filed an Answer to the Liquidator's Complaint, and later an Amended Answer to the Complaint, which included affirmative defenses in the form of new matter by which it seeks a declaration from this Court that it is entitled to direct access to Swiss Re's obligations under the LPT and GCP agreements at issue in this case, and in accordance with the parties' intentions and course of performance, under theories of third-party beneficiary and/or reformation as articulated in *Koken v. Legion Ins. Co.*, [583 Pa. 400,] 878 A.2d 51 (Pa.2005), *affirming* 831 A.2d 1196 (Pa. Commw.2003).

7) From 1977 to April 1, 1998, Times Mirror was self-insured for its statutory workers' compensation obligations in several states and up to certain amounts.

8) Specifically, Times Mirror was self-insured for any liability it incurred for workers' compensation liability up to $1,000,000 per occurrence in California, New York,

Maryland, Connecticut, Rhode Island, Oregon, Colorado, and Pennsylvania, and it was covered by various excess policies for amounts exceeding $1,000,000 per occurrence.

9) To cover its liability to pay its self-insured workers' compensation liabilities, as of late 1997/early 1998 Times Mirror had established a reserve of over $42 million. This reserve was determined actuarially to cover the self-insured portion of Times Mirror's workers' compensation obligations that accrued between 1977 and April 1, 1998.

10) These self-insured workers' compensation obligations were known and existing liabilities that Times Mirror already had incurred. The workers already had suffered an injury or illness that entitled them to workers' compensation benefits; these claims already had been presented to Times Mirror; Times Mirror already had paid certain amounts on such claims; and Times Mirror was liable to pay additional amounts on such claims for many years in the future.

11) In late 1997 and early 1998, Times Mirror's insurance broker, J & H Marsh & McLennan ("Marsh"), recommended that Times Mirror consider transferring its known and existing self-insured workers' compensation liabilities to an insurance company, as well as fully insuring its workers' compensation obligations on a going forward basis.

12) Marsh proposed that Times Mirror accomplish the transfer of its known and existing self-insured workers' compensation liabilities through a "retrospective" program whereby those self-insured workers' compensation obligations that already had accrued, and that were fully reserved for by Times Mirror, would be transferred to and fully assumed and discharged by a third party insurance company, thus relieving Times Mirror of any further obligation for these liabilities.

13) This "retrospective" program was an LPT. Unlike a standard or traditional insurance policy, which involves payment of a comparatively small premium in exchange for comparatively larger insurance limits, the LPT involved Times Mirror's payment of the actuarially determined net present value of the workers' compensation obligations being transferred to and assumed by the insurer, *i.e.*, approximately $42 million.

14) Marsh prepared and made submissions to potential insurers of the LPT on behalf of Times Mirror.

15) In January 1998, Marsh contacted Swiss Re to determine whether Swiss Re would be interested in assuming Times Mirror's known workers' compensation liabilities through the LPT.

16) Upon reviewing the Times Mirror information, Swiss Re contemplated assuming the Times Mirror LPT either with the use of an insurance company that would serve as a "front" for Swiss Re or directly without a "front."

17) "Fronting" companies typically retain little or no liability and instead pass such liability on to reinsurers. "Fronting" is an arrangement where an insurer that is licensed to do business agrees to enter into an agreement so that the "insured" will have access to any required "insurance" documentation, but the liabilities will be the responsibility of and will be paid by, another reinsurer. Reinsurance Contract Wording 113 (Robert W. Strain, ed., 3d ed. 1998).

18) Swiss Re acknowledged that it was planning on participating in the transaction and ultimately determined that it would need the participation of an insurance company to act as a front because of

the timing of the transaction and the fact that Swiss Re could not issue the requisite insurance documentation needed for the transaction.

19) Reliance was ultimately chosen to serve as the fronting carrier.

20) Times Mirror, Reliance and Swiss Re implemented the LPT by entering into several agreements at virtually the same time. In March 1998, before these agreements were finalized, Reliance issued a Binder of Insurance covering the LPT ("LPT Binder"), evidencing that Times Mirror was fully "insured" for the LPT liabilities.

21) The LPT Binder provided that, for a gross "premium" of $42,826,250, Reliance would provide the following coverage:

> **Coverage(s):** Workers Compensation/Employers Liability Coverage, including Other States Coverage, Loss Portfolio Transfer (LPT) for all previously self insured claims wherever Times Mirror Company and Subsidiaries were a qualified self insurer, for each year of the contract.

22) The total payment to Reliance of $42,826,250 under the LPT represented the net present value of the estimated ultimate claim payments and expenses to be incurred in the investigation, settlement, and payment of claims.

23) Unlike traditional insurance, where the policyholder pays a fractional portion of the risk in return for sizeable coverage limits insuring contingent risks, Times Mirror pre-paid the full value of its known losses prior to the inception of the LPT.

24) In April 1998, after a credit of $5,356,110 was given to Times Mirror for claims that were supposed to be covered by the LPT but were paid by Times Mirror as a result of delays in transferring the liabilities, Times Mirror was invoiced $37,470,140 net for the LPT.

25) Contemporaneous with the issuance of an LPT Binder confirming that the transaction was bound, Robert Rey of Reliance sent Dave Powell of Swiss Re a deal memo confirming in writing Swiss Re's participation in the transaction.

26) With respect to the LPT, this memo reflected that Reliance would transfer most (over 85%) of Times Mirror's upfront payment to Swiss Re in exchange for Swiss Re's assumption and payment of Times Mirror's pre-existing workers' compensation liabilities on a first dollar basis.

27) Upon consummation of the Times Mirror/Reliance LPT agreements, Reliance and Swiss Re entered into a "Quota Share Reinsurance Agreement" (the "Reliance/Swiss Re LPT Agreement"), whereby the pass through of nearly all the monies paid by Times Mirror for assumption of its LPT liabilities and the transfer of these liabilities was memorialized, and Swiss Re became responsible for paying 100% of the liabilities covered by the Times Mirror/Reliance LPT Agreement at a first dollar level, subject to certain caps.

28) At the time of the deal, Swiss Re admitted that the LPT transaction was one where "Reliance National fronted the [LPT] cover [and] Swiss Re assumed 100% of the risk." I TR 40, at 0575. *See also* II TR 65, at 1069 (Philip Reda, a member of Swiss Re's senior management and the home office technical resource assigned to this transaction, testified that Reliance acted as a fronting company for Swiss Re).

29) Pursuant to the Reliance/Swiss Re LPT Agreement, Reliance paid Swiss Re $31, 050.169 of the $37,470,140 it received from Times Mirror.

30) Reliance insisted that Swiss Re identify the $31,050,169 as a "fee," rather than a "premium."

31) in exchange for the $31,050,169, Swiss Re agreed to directly fund up to $42,525,000 of the Times Mirror liabilities, subject to interim and overall aggregate caps.

32) As to the caps specifically, the Reliance/Swiss Re LPT Agreement limited Swiss Re's obligation to $1,000,000 per occurrence for the LPT.

33) The Reliance/Swiss Re LPT Agreement also had annual and overall caps on what Swiss Re was obligated to pay in any annual period and over the lifespan of the LPT:

> This means we [Swiss Re] protect ourselves with aggregate limits in more ways than one. First, the aggregate limit on the LPT is an absolute cap on how much we pay, regardless of how fast or slow the losses pay out. Second, we offer a lower-priced option with a series of interim aggregate limits, increasing over time, to keep loss payouts from speeding up relative to the payment pattern used in our discounting calculation.

II TR 97, at 0176.

34) Although Reliance had no limits on what it was obligated to pay under the LPT, it was only if the various caps established by Swiss Re were exceeded that Reliance could have possibly incurred any financial responsibility in connection with the LPT.

35) However, even if Swiss Re's per occurrence payment responsibilities exceeded the established caps, any obligation of Reliance would have been covered by traditional excess policies that Times Mirror had in place prior to entering into the LPT.

36) In particular, Times Mirror had traditional excess insurance that applied to any workers' compensation claim covered by the LPT where the liability exceeded the $1,000,000 per occurrence that was the responsibility of Swiss Re under the LPT.

37) Because the Times Mirror LPT only transferred the self-insured portion of Times Mirror's claims. Times Mirror ensured that Reliance was not exposed to the "insured" portion of any claim by assigning its excess insurance to Reliance.

38) Thus, Reliance would have been covered by Times Mirror's excess policies for any liabilities above the $1,000,000 cap on Swiss Re's per occurrence payment responsibilities.

39) To ensure that Swiss Re, and not Reliance, would be responsible for the assumption of Times Mirror's workers' compensation obligations, Reliance entered into a Claims Service Agreement ("CSA") with a third party administrator ("TPA"), Crawford and Company ("Crawford").

40) Pursuant to the terms of the CSA, Reliance placed itself in the role of guarantor and shifted all of its claims obligations, including its obligation to pay the claims, to Swiss Re:

> VIII. *Guarantor.* All obligations recited in this Agreement ... wherein [Reliance] agrees to pay and make funds available to [the TPA's] Loss fund Account (including implementation of procedures to make funds available) to enable [the TPA] to pay Claims and/or losses and associated Allocated Loss Expenses, are intended to and hereby do make [Reliance] the guarantor thereof. [Reliance] requests, and [the TPA] hereby agrees to submit billings for payments to its Loss Fund Account directly to [Reliance's] reinsurance carrier. [Swiss Re] for payment directly to [the TPA] ... Any specific billing items disputed by Swiss Re will be mutually resolved between [the TPA] and Swiss Re.

41) Consistent with the CSA and Swiss Re's assumption of Times Mirror's liabilities, from approximately May 1998 to October 2001, Swiss Re paid Times Mirror's workers' compensation claims under the LPT.

42) Consistent with its obligations to pay the LPT liabilities directly, Swiss Re directly funded a paid loss account with Crawford through which the Times Mirror LPT claims were paid.

43) Crawford created a flow chart demonstrating that Swiss Re was directly responsible for the payment of the LPT claims. This chart specifically indicated that, "Swiss Re America agrees to directly fund Crawford for this program." II TR 61, at SR 9266; II TR 62, at SR 9420.

44) Swiss Re paid the TPA approximately $27 million on LPT workers' compensation claims that involved the January 1977 to April 1998 period, as it was required to do under the Reliance/Swiss Re LPT Agreement.

45) There is no evidence in the record that Reliance ever paid a single Times Mirror LPT claim.

46) On October 3, 2001, Reliance was found to be insolvent and placed into liquidation.

47) When Reliance was placed in liquidation, Tribune, in its capacity as Times Mirror's successor-in-interest, undertook to have Swiss Re continue its performance of the obligations to pay the outstanding workers' compensation obligations.

48) Swiss Re refused to continue to pay unless the Liquidator consented.

49) The Liquidator refused to consent.

50) Swiss Re stopped paying Times Mirror's outstanding LPT workers' compensation obligations.

51) As a result, Tribune has been forced to reassume and pay, and has been subject to demands that it pay, over $10,000,000 in workers' compensation liabilities and associated expenses that had been assumed by Swiss Re.

52) Tribune attempted to mitigate its losses by submitting claims to the insurance guaranty associations in the states covered by the LPT.

53) Tribune's mitigation attempts, however, were unsuccessful because these guaranty associations uniformly concluded that the LPT was not "insurance" and, therefore, there was no guaranty fund protection.

### Conclusions of Law

1) This Court has subject matter jurisdiction over this action pursuant to 40 P.S. § 221.1 *et seq.* and 42 P.S. § 761(a)(2).

2) Summary judgment may be entered where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Pa. R. Civ. P. 1035.2.

3) This case is about Tribune's right to direct access to Swiss Re's assumed obligations under the LPT. Accordingly, it involves whether such access is authorized under Article V of the Insurance Department Act of 1921, 40 § 221.1 *et seq.*, and thus is governed by Pennsylvania law, including *Koken v. Legion Ins. Co.*[, 583 Pa. 400], 878 A.2d 51 (Pa.2005), *affirming* 831 A.2d 1196 (Pa.Commw.2003).

4) The general rule in liquidations is that "the liability of the reinsurer is intended to run to the estate of the insolvent insurer for the eventual benefit of the insureds, and not directly to the policyholders of the insurer." *Eastern Engineering v. American Reinsurance Co.*[, 309 Pa.Super. 578], 455 A.2d 1235, 1237 (Pa.Super.1983).

5) This general rule is recognized by Pennsylvania courts, including the *Legion* Court. *See Legion*, 831 A.2d at 1234.

6) However, *Legion* also held that direct access may be appropriate on a third party beneficiary theory or through reformation of an agreement. *Id.* at 1236, 1241–42.

7) Under Pennsylvania law, an insured may obtain direct access to a reinsurer's obligations in the event of an insurer's insolvency where circumstances warrant. *Id.* at 1236.

8) Direct access to "reinsurance" is a right established on a case-by-case basis, based on the totality of the facts and circumstances. *Id.*

9) Although reinsurance proceeds typically become general assets of the estate in liquidation proceedings where there is a traditional insurer-reinsurer relationship, this general rule may not apply in situations "where the insolvent insurer acted only as a pass-through and not as a true insurer." *Id.*

10) Even absent contractual privity, it is appropriate under certain circumstances to allow a policyholder to have direct access to a reinsurer. *Id.* at 1239–40.

11) Where entitlement to direct access to "reinsurance" is shown, there is no unlawful preference under Pennsylvania law. *Id.*

12) Direct access to reinsurance is appropriate under a third-party beneficiary theory where "(1) recognition of the beneficiary's right [is] 'appropriate to effectuate the intention of the parties,' and (2) contract performance ... "satisf[ies] an obligation of the promisee to pay money to the beneficiary' or 'the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance." *Id.* at 1237.

13) Factors to consider when determining whether this two-part test has been satisfied so as to allow a policyholder direct access to reinsurance include:

(a) whether the insurer took on any underwriting risk or acted as a front, *id.* at 1237–38.

(b) whether the insurer entered into the transaction in order to generate fees, not premium, *id.* at 1234.

(c) whether "the 'reinsurer' functioned as the direct insurer" for the policyholder and whether the "claims handling process [and] the funding of claims ... [w]as the responsibility of the reinsurers," *id.* at 1237–38.

(d) whether the policyholder facilitated the reinsurer's involvement, *id.* at 1241, 1247.

(e) whether the equities favor the policyholder's claim to direct access, *id.* at 1242, 1246.

14) These factors are not a checklist of specific facts that must be present in order to permit direct access, nor are they a checklist that must be present in precisely the same way as existed in *Legion*. Rather, the factors are overarching criteria by which to analyze the particular facts involved in a transaction for purposes of deciding the issue of direct access to "reinsurance." *Id.* at 1236.

15) An insured may be a third-party beneficiary with a right to direct access from a reinsurer notwithstanding the lack of an express "cut-through" provision in the relevant agreements. As the *Legion* Court explained:

Section 534 of Article V does not require a cut through endorsement in the form of holy writ; it does not even use the term "cut-through." Even if the statute had used those works, its meaning would be less than clear in light of the fact that

there is more than one way to effect a cut through.

*Id.* at 1241.

16) Alternatively, the court may "reform" the reinsurance agreement to permit direct access in order to (1) "ensure that the [Liquidator's] actions are consistent with equitable principles and serve the interest of policyholders, and (2) "to reflect the parties' intent if necessary and appropriate to avoid prejudice to policyholder rights." *Id.* at 1242.

17) The factors identified in *Legion,* when applied to the facts of this case, weigh in favor of granting Tribune direct access to Swiss Re, and taken together dictate that Tribune is entitled to Swiss Re's continued performance of its LPT obligations and should be afforded direct access to those obligations.

18) First, Reliance served merely as a front to pass through Times Mirror's preexisting self-insured workers' compensation liabilities to the true primary obligor, Swiss Re, in return for Swiss Re receiving the up-front payment of the net present value of these liabilities (minus the Reliance fronting fee).

19) Swiss Re assumed 100% of the Times Mirror LPT at a first dollar level, dictating that Swiss Re would pay these liabilities in full, subject to caps that put a limit on Swiss Re's payout obligations.

20) Although Reliance did not have similar limits on its obligations under the LPT, it was only if Swiss Re's per occurrence payment responsibilities had exceeded the established caps that Reliance could have incurred any financial responsibility. However, any such responsibility would have been covered by traditional excess policies that Times Mirror had in place prior to entering into the LPT, and that Times Mirror had assigned to Reliance.

Thus, in effect, Reliance retained no liability.

21) Second, Reliance demanded that Swiss Re account for Reliance's pass-through payment to Swiss Re as a "fee" instead of a "premium."

22) Third, the CSA that Reliance entered into with the TPA expressly provided for Swiss Re's direct funding of the TPA's LPT claim account.

23) Lastly, the equities favor permitting Tribune direct access to the LPT claims in light of the fact that Tribune has already paid the net present value of the LPT claims up-front and would be forced to pay for them a second time if direct access is not allowed. Moreover, Tribune has limited, if any, guaranty fund protection precisely because the LPT did not involve traditional insurance or reinsurance that would trigger such protections.

24) When applied to the facts of this case, the factors identified in Legion establish that Tribune is entitled to direct access to Swiss Re's obligations under the LPT.